1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   VICTORIANO LEMOS MEJIA,                    CV F   03-5489 REC DLB HC

10                      Petitioner,            FINDINGS AND RECOMMENDATIONS
                                               REGARDING PETITION FOR WRIT OF
11           v.                                HABEAS CORPUS

12                                             [Doc. 1]
     SYLVIA GARCIA, Warden,
13
                         Respondent.
14   _____/

15           Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
16
     pursuant to 28 U.S.C. § 2254.
17
                      PROCEDURAL BACKGROUND[1]
18
             On June 23, 1999, in the Tulare county Superior Court, Petitioner was convicted of five
19
     counts of rape by force or fear, two counts of kidnapping, two counts of assault with a firearm,
20
     and one count of assault with a deadly weapon.  Petitioner was sentenced to sixty one years and
21
     four months in state prison.
22
             Petitioner filed a timely notice of appeal with the Court of Appeal for the Fifth Appellate
23
     District.  On February 26, 2002, the Court of Appeal modified the judgment to provide that the
24
     four-year sentence on count 3 (assault with a deadly weapon) be stayed pending successful
25
     completion of the sentence imposed on counts 1 and 2 (forcible rape) and permanently thereafter;
26
     the eight-month firearm enhancement on count 7 (forcible rape of M.) be stricken; and the three-
27

28           _____
                 [1]  This information is derived from the petition for writ of habeas corpus and Respondent's answer.

                                                      1

1   year firearm enhancement on count 8 (kidnapping of S.) be stricken.  The portion of the judgment

2   which imposed a fine under section 1202.45 was vacated and the judgment was affirmed in all

3   other respects.  (Exhibit D, attached to Respondent's Answer, at 37.)

4        Petitioner filed a petition for review with the California Supreme Court.  The petition

5   was denied on May 1, 2002.  (Exhibit F, attached to Respondent's Answer.)

6        Petitioner filed the instant petition for writ of habeas corpus on April 21, 2003.  By order

7   of November 17, 2003, the court directed Respondent to file a response to the petition.

8   Respondent filed an answer on February 13, 2004, and Petitioner filed a traverse on September 1,

9   2004.

10        On October 7, 2005, the Court directed Respondent to submit supplemental briefing in

11   light of the Ninth Circuit's opinion in <u>Gibson v. Ortiz</u>, 387 F.3d 812 (9th Cir. 2004), which was

12   issued after the parties submitted their initial briefing.  Respondent submitted its supplemental

13   briefing on November 4, 2005.  (Court Doc. 25.)

14   STATEMENT OF FACTS[2]

15        In the summer of 1989, 18-year-old M. was residing in Guataho, a small
     village in Michoacan, Mexico.  M. contacted her sister , S., who lived in the

16   United States with her husband, [Petitioner].  M. wanted to come to the United
     States, so [Petitioner] made arrangements to smuggle M. across the border.  M.

17   testified she was coming to the United States to work as a babysitter for her sister,
     who had six or seven children at the time.

18        After M. was smuggled into the United States, she met [Petitioner] in Los
     Angeles. [Petitioner] had two of his small children with him at the time.

19   [Petitioner] took M. and the children to a motel.  When the children were asleep,
     [Petitioner] put a knife to M.'s neck.  M. pushed, kicked and tried to defend

20   herself. [Petitioner] told M. he wanted to have sexual intercourse with her, but M.
     said she did not want to.

21        While holding the knife, [Petitioner] tore off M.'s clothing before taking
     off his own pants. [Petitioner] then forced M. to have sexual intercourse with him.

22   M. testified [Petitioner] put his penis into her vagina "around two times" because
     she was resisting.  M. did not scream because [Petitioner] told her no one would

23   hear her.  M. did not sleep that night because she was afraid.  She considered
     running out of the room, but she did not know her way around.  [Petitioner] told

24   M. there was nothing she could do about being raped, because no one would help
     her.  M. did not report the rape.  In her experience in Mexico, the police were

25   regularly bribed.

26   _____

27        [2] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth
     Appellate District appearing as Exhibit D, of the Answer to the Petition for Writ of Habeas Corpus.  The Court finds

28   the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

The following morning, several men came to pick up [Petitioner], M., and the children. [Petitioner] warned M. not to tell his wife, S., about what had happened in the motel.

Once M. arrived at [Petitioner] and S.'s house, M. did not tell S. what had happened because she was afraid of [Petitioner]. The house had two bedrooms. [Petitioner] and S. slept in one bedroom. Several of [Petitioner's] daughters slept in the other bedroom. [Petitioner's] sons slept in one corner of the living room. M. slept in another corner of the living room on a sofa. A number of weeks later, M. told S. that [Petitioner] had raped her. S. spoke to [Petitioner]. M. told S., because she did not want S. to think she was interested in [Petitioner].

At about that same time, M., [Petitioner] and S. attended a celebration in town together. [Petitioner] became drunk. After leaving the celebration, [Petitioner] told M. he was the first one who "tasted her honey" and he wanted more. [Petitioner] became angry, took out a gun, and slammed M. and S's heads together. [Petitioner] forced M. and S. to get into the truck at gunpoint. [Petitioner] then drove the women to an orange grove. [Petitioner] then forced the women to get out of the truck and walk a field at gunpoint. [Petitioner] threatened to kill the women. [Petitioner] fired the gun twice at the women, once off to the side and once near their feet.

[Petitioner] then told S. to start walking so he could shoot her in the back. S. turned and began walking. [Petitioner] pointed the gun at S. and told M. he would not kill her if M. started having sexual intercourse with him. M. agreed because she was afraid of [Petitioner] and did not want him to kill her sister. At one point, [Petitioner] put the gun against S.'s head. [Petitioner] warned M. he would kill her if she ever reported him to anyone.

[Petitioner] forced both women back into the truck. [Petitioner] drove fast and at one point stated he felt like killing someone. [Petitioner] then hit and killed a coyote crossing the road.

M., and S., and [Petitioner] returned home. While M. was on the sofa and the boys were asleep, [Petitioner] got on top of M. and grabbed and touched her. M. tried to push [Petitioner] away, but she thought he had a gun and he reminded her that she had promised to have sex with him. M. told [Petitioner] she had said that in order to spare S.'s life. [Petitioner] then forced M. to have sexual intercourse with him.

Later in the summer, while the family was living at a labor camp in Kerman, [Petitioner] took M. and two of his children to Porterville to get a green card. On the way home, [Petitioner] stopped at the family's former residence, which was then empty. M. locked herself and the two children in the car, but [Petitioner] opened the door and pulled M. out. [Petitioner] raped M. inside the residence.

M. never told any of her coworkers about [Petitioner]. Everyone knew [Petitioner] carried a gun. [Petitioner] drove M. to work and did not let anyone talk to her without him being present.

Once the family returned to the first residence, [Petitioner] again raped M. M. testified that over the three months that she lived at the house, [Petitioner] came into the living room and raped her about 20 to 30 times. On once such occasion, S. came into the living room and told [Petitioner] to go back to his bedroom. When S. and [Petitioner] were back in their bedroom, M. could hear [Petitioner] beating S.

In October of 1989, M. pretended to take a shower and let the water run. She left the house through the bathroom window and ran to a neighbor. The neighbor spoke only English and took M. to Norma Hunt, who spoke Spanish. While at the Hunt residence, [Petitioner] and S. came looking for M. but were told she had not been seen. Hunt assisted M. in locating her brother, Juan. M. had seen Juan while she was living at [Petitioner's], but [Petitioner] would not allow

her to be alone with Juan. M. told Hunt [Petitioner] had treated her badly, but she did not mention the rapes.

M. did not tell her brother about the rapes because she did not want him to get made and fight [Petitioner]. M's brother took her to stay with Alicia Vigil. M. eventually told Vigil about the rapes and then decided to report [Petitioner] to the police. Vigil took M. to the police station, and from there she was taken to the hospital to have a sexual assault exam. After going to the police, M. did not see [Petitioner] again.

Dr. Andrew G. Mitchell, Jr. conducted an examination of M. He did not observe any injuries to M., but determined, based on the absence of a hymen and M.'s history, that she had been raped.

S. testified she and [Petitioner] had been married for 24 years and had 10 children together. S. stated M. told her approximately two weeks after she came to live with them that [Petitioner] was abusing her. S. did not confront [Petitioner] because she was afraid of him. He had previously hit her in the face and threatened her with a gun and a knife. When S. did confront [Petitioner], he became angry and hit her in her face, causing her to bleed from her mouth and nose.

S. confirmed M.'s account of [Petitioner] taking them to the orange grove. S. testified [Petitioner] told them he was taking them to the orange grove because he was going to kill them.

S. heard [Petitioner] in the living room with M. on occasion. She heard M. tell [Petitioner] to get off of her. She also saw [Petitioner] on top of M. on one occasion. S. told M. there was nothing she could do because she was afraid of [Petitioner]. M. told S. on several occasions that she wanted to escape and call the police.

S. confirmed M.'s account of how she ran away. After M. escaped, [Petitioner] made S. get into the truck with him so they could search for M.

When police arrived at [Petitioner's] residence looking for him, he had already left for Mexico to avoid the police. [Petitioner] told S. he was leaving because M. was going to talk to the police. When investigators first questioned S., she lied and told them she did not believe [Petitioner] had raped M. [Petitioner] threatened S. and told her to lie to the police and not say anything. S. also lied to the police about the incident in the orange grove. S. did give the police officer [Petitioner's] gun, which she had hidden in her purse. [Petitioner] had given S. the gun before he left for Mexico. S. wrote [Petitioner] a letter telling him the police were looking for him.

[Petitioner] telephoned S. from Mexico and told her to move the family to Oregon, which she did. [Petitioner] joined them in Oregon. While they were in Oregon, [Petitioner] used a false name and identification card of his deceased brother so the police could not locate him.

While the family was in Oregon, [Petitioner] and S.'s teenaged daughter told S. [Petitioner] had been sexually abusing her. S. did not go to the police because she was afraid of [Petitioner]. The daughter, who was aware the police were looking for [Petitioner], telephoned her former high school counselor in California and told her [Petitioner's] location. When S. found out about the call, she told [Petitioner]. In response, [Petitioner] moved the family back to Mexico, but sent S. and one of his sons to California.

The daughter was 15 years old when M. came to live with her family. The daughter confirmed M.'s testimony about how she left the residence. When the police came to their house after M. left and [Petitioner] fled to Mexico, the daughter told the police that M. had told her [Petitioner] had raped her. She had not observed any of the rapes, but had heard M. crying and telling [Petitioner] to stop, to get off of her, and leave her alone. The daughter testified she had been sexually abused by [Petitioner], but did not tell anyone what was happening

4

because she was afraid of [Petitioner] who had threatened to hurt her if she said anything. [Petitioner] did not allow anyone in the family to go out and do anything on their own.  The daughter frequently heard and saw [Petitioner] beat S.

On October 21, 1989, Detective Jess Gutierrez took a statement from M. before taking her to the hospital for a sexual assault examination.  The interview was tape recorded, but the tapes were erased in 1994 and not available at trial. Detective Gutierrez did not notice any injuries on M.

Detective Gutierrez went to [Petitioner's] residence in response to M.'s allegations. Detective Gutierrez spoke to S., who appeared upset and somewhat evasive.  S. initially denied knowledge of any sexual abuse by [Petitioner], but did inform the detective where [Petitioner] might be located.  S. told Detective Gutierrez she did not believe [Petitioner] raped M. and denied [Petitioner] brandished a gun at her and M. in the orange grove.  S. stated she did not remember [Petitioner] saying he wanted to kill someone or that he had driven over a coyote on the road.

Detective Gutierrez also spoke to the daughter, who was upset and did not want to talk.  When Detective Gutierrez took the daughter into another room away from S., the daughter began crying and told Detective Gutierrez she was aware [Petitioner] had raped M.  The daughter told Detective Gutierrez she had not seen [Petitioner] rape M.  Detective Gutierrez asked the daughter if [Petitioner] had raped or molested her, but she stated he had not.  Detective Gutierrez did not take a detailed statement from the daughter at that time.

Detective Gutierrez spoke to [Petitioner's] sister and brother-in-law, who told him [Petitioner] had left for Mexico 10 days earlier.  Detective Gutierrez informed other law enforcement agencies [Petitioner] was wanted for suspicion of rape.

On March 29, 1990, Marcy Herrera from Woodlake High School called Detective Gutierrez and informed him [Petitioner] was in Oregon.  Detective Gutierrez called authorities in Oregon and told them of [Petitioner's] possible location.  Authorities in Oregon were unable to locate [Petitioner] there.

In February of 1999, Detective Gutierrez learned [Petitioner] had been apprehended and brought back to California.  Detective Gutierrez contacted the daughter a few days later and spoke with her on the telephone.  The daughter told Detective Gutierrez [Petitioner] had touched her vagina while they were living in California, but she did not state whether [Petitioner] had touched her underneath her clothing.  The daughter told Detective Gutierrez [Petitioner] had abused M. The daughter also explained why she had lied to Detective Gutierrez during the earlier interview.

Detective Gutierrez then taped an interview with S.  S. stated she was afraid of [Petitioner] and feared for her family.  S. also told Detective Gutierrez [Petitioner] had abused M. and she explained why she had lied to Detective Gutierrez when she spoke to him in 1989.

UNCHARGED SEX ACTS AGAINST THE DAUGHTER

The daughter testified [Petitioner] sexually molested her even before M. came to live at their house.  [Petitioner] had touched her genital area and breasts, over and under her clothing.  When the police questioned the daughter, she did not tell them of the molests because she was afraid of [Petitioner].  He had beaten her with ropes before.

After [Petitioner] left for Mexico, he called and told his family to meet him in Oregon.  Before [Petitioner] joined his family in Oregon, the daughter called her high school counselor and Detective Gutierrez to tell them where [Petitioner] was located.  One of the daughter's brothers's told S. about the calls.

[Petitioner] then took several of his children, including the daughter, to Mexico.  While the daughter was with [Petitioner] in Mexico, an investigator

5

came to the village where they were staying. [Petitioner], thinking the investigator was there looking for him, took his children with him to another village and hid in a hole in the ground.  While they were hiding in the hole, [Petitioner] told the daughter, who was 15 at the time, that she was "going to lend him my private parts." [Petitioner] touched her genital area.  When they left the hole and went to a house for the night, [Petitioner] took out his gun, placed it under his head and raped the daughter.  He later told her "that was my punishment for having called the police."  After that, he raped her almost every night.

The daughter testified that a few days after the initial rape, S. arrived in Mexico and stayed there for six or seven months before S. and [Petitioner] returned to the United States.  After her parents left, the daughter told her grandmother [Petitioner] had raped her, but she did not believe her.  The daughter did not contact the police in Mexico because she did not think they would do anything.

When [Petitioner] picked up his children to return them to the United States, he took them to a motel in the Woodlake area.  In the middle of the night, [Petitioner] raped the daughter.  He told her he was raping her because she had told her grandmother about him.  [Petitioner] told the daughter that if she ever told the police, he would kill her and S. and throw their bodies onto the train tracks.

[Petitioner] continued to rape the daughter until she moved out of the house in 1994.  One year later, the daughter reported the rapes to the police in Oregon.  The police told her they could not pursue criminal charges against [Petitioner] but would send police reports to California.  After she moved out of the house, the daughter also told S. [Petitioner] had raped her.  S. became angry and the daughter overheard her confront [Petitioner].  After that, [Petitioner] and S. separated.

In February of 1999, the daughter told California authorities [Petitioner] had touched her private parts, but did not recall if she told them he touched her on top of or under her clothing.  In May of 1999, the daughter told the police [Petitioner] had touched her underneath her clothing.

DEFENSE

[Petitioner] testified that his relationship with M. was consensual, that the incident in the orange grove had not occurred, and that he never molested his daughter. [Petitioner's] son Victorino, Jr., also testified that [Petitioner's] relationship with M. was consensual.  Victorino, Jr., stated [Petitioner] had never molested his sister.  Another daughter of [Petitioner], who was six or seven when M. lived with them, testified [Petitioner] never sexually molested her, her sister, or M.

(Exhibit D, attached to Respondent's Answer, at 3-10.)

## DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

1    out of the Tulare County Superior Court, which is located within the jurisdiction of this Court.

2    28 U.S.C. § 2254(a); 2241(d).

3          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

4    of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

5    enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S.

6    1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting

7    Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

8    1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

9    (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant

10   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

11   B.    Standard of Review

12         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

13   custody pursuant to the judgment of a State court only on the ground that he is in custody in

14   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

15         The AEDPA altered the standard of review that a federal habeas court must apply with

16   respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

17   Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

18   will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

19   to, or involved an unreasonable application of, clearly established Federal law, as determined by

20   the Supreme Court of the United States;" or "resulted in a decision that was based on an

21   unreasonable determination of the facts in light of the evidence presented in the State Court

22   proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

23   the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

24   Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

25   because that court concludes in its independent judgment that the relevant state-court decision

26   applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

27   omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

28         While habeas corpus relief is an important instrument to assure that individuals are

constitutionally protected, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115 S.Ct. 1769 (1995); <u>Thompson v. Keohane</u>, 516 U.S. 99, 116 S.Ct. 457 (1995); <u>Langford v. Day</u>, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.   <u>Admission of Uncharged Sexual Offenses Against Daughter - Trial Court Abuse of Discretion (Claim One)</u>

Petitioner contends that the trial court abused its discretion by admitting evidence of his prior sexual abuse of his daughter pursuant to California Evidence Code section 1108.

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. <u>Estelle</u>, 112 S.Ct. at 477; <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. <u>Estelle</u>, 112 S.Ct. at 482; <u>Pulley v. Harris</u>, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); <u>Walters v. Maas</u>, 45 F.3d 1355, 1357 (9th Cir. 1995); <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994); <u>Gordon v. Duran</u>, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  <u>Id</u>. at 920.  Intent is a permissible inference that the jury may draw from the evidence of prior bad acts.  <u>See</u> <u>Houston v. Roe</u>, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

Prior to trial, the prosecution filed a motion to introduce evidence of Petitioner's previous

sexual misconduct toward his daughter pursuant to California Evidence Code 1108. (CT 161-175.)  Defense counsel opposed the motion.  (RT 13.)  A hearing was held, at which time the court determined that the probative value outweighed its prejudicial effect and admitted the evidence under California Evidence Code 1108 to show the character and disposition of the Petitioner in this case to commit this particular type of offense. (RT 19-23.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held as follows:

> Here, the daughter's testimony was reasonably related to the issues, credibility in particular, involved in [Petitioner's] sexual misconduct with M.  In both cases, [Petitioner's] sexual assaults involved threats of death or injury if either of them ever told anyone and involved [Petitioner] in a position of trust with family members whom he was well acquainted with.  The incidents involving the two victims were not qualitatively different.  The evidence of the past offenses was no more inflammatory than the charged offenses.  The evidence was not confusing to the jury; the jurors could well separate the two incidents in their minds and judge each on its own facts.  Both victims testified, minimizing a risk of confusion.  Also, both victims were cross-examined, and the jury could determine their credibility.  The evidence was not inflammatory, and it was probative. [Petitioner] was not unduly prejudiced by the introduction of the prior incident of similar sexual misconduct.  The trial court did not abuse its discretion.
>     In any event, evidence of [Petitioner's] prior misconduct bolstered, but did not take the place of, the credible testimony given by M. and S., and M's report of the rapes soon after she fled [Petitioner's] residence.  We cannot say that [Petitioner] was prejudiced by the introduction of the evidence of his prior sexual misconduct with the daughter because it is unlikely the result of the trial court would have been different had the evidence not been submitted. [citations.]

(Opinion, at 14-15.)

Petitioner asserts that the trial court incorrectly applied the law under California Evidence Code section 352 because the evidence regarding the abuse of his daughter was more prejudicial than probative, it was not similar to the charged offenses, and it was inflammatory.

California Evidence Code section 1108 provides in pertinent part:

> (a) In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.

Section 1101(b) provides:

> Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in

9

1    good faith believe that the victim consented) other than his or her disposition to
2    commit such an act.

3    Section 352 provides:

4         The court in its discretion may exclude evidence if its probative value is
     substantially outweighed by the probability that its admission will (a) necessitate
     undue consumption of time or (b) create substantial danger of undue prejudice, of
5    confusion of the issues, or misleading the jury.

6     The evidence of Petitioner's sexual abuse of his daughter was compelling and probative.

7    The trial court properly weighed the prejudicial effect of the evidence versus its probative value

8    and reasonably concluded that it was admissible under section 352.   Specifically, the trial court

9    held as follows:

10        I'm making a finding that Norma Mejia's [Petitioner's daughter's]
     testimony would probably, even at the longest, not take up an unduly amount of
11   time.  It would be one half to one day at the most, including the cross-
     examination.  I realize there will be some defense evidence that may tend to
12   discredit her.  Again, that would not be that unduly long.  I think the importance
     of this evidence is going to overshadow any length of time that it may take.

13

14   (RT 20-21.)

15        Petitioner's trial was not rendered fundamentally unfair because of the admission

16   of evidence of Petitioner's prior uncharged offenses against his daughter.  The trial court took

17   time and properly considered the evidence prior to its admission.  The incidents described by

18   Petitioner's daughter were no more inflammatory than the circumstances of the charged crimes.

19   Further, as noted by the trial court, the testimony was not unreliable as the daughter was there to

20   testify in person and subject to cross-examination. (RT 21.)  As stated, the jury could either

21   believe or not believe her.  The trial court's admission of this evidence was not contrary to, or an

22   unreasonable application of Supreme Court precedent.  Accordingly, Petitioner fails to state a

23   claim for relief.

24   D.   Admission of Uncharged Sexual Offenses Against Daughter - Violation of Due Process
          (Claim Two)
25

26        Petitioner contends that California Evidence Code section 1108 violates the Due Process

27   Clause because it allows propensity evidence of uncharged sexual offenses to be proven by a

28   preponderance of the evidence, thereby allegedly lowering the prosecution's burden of proof.

10

1    The Court of Appeal rejected Petitioner's claim holding:

2        [Petitioner's] contention that the admission of evidence of prior sexual
3    misconduct to show propensity to commit the charged offense dilutes this
     standard is without merit.  The jury was instructed that the question it was to
4    decide was whether [Petitioner] committed the crimes charged and that he could
     be found guilty only if the jury was convinced beyond a reasonable doubt that he
5    committed the crimes.  (CALJIC Nos. 2.50.01, 2.90.)  While the admission of
     evidence of prior sexual misconduct may have added to the evidence the jury
6    could consider, it did not lessen the prosecution's burden to prove [Petitioner's]
     guilt beyond a reasonable doubt.

7    (Opinion, at 17.)

8        As Respondent submits, in <u>United States v. LeMay</u>, 260 F.3d 1018 (9th Cir. 2001), the

9    Ninth Circuit rejected the argument that the traditional ban on the admission of propensity

10   evidence qualifies as a "fundamental" principle of justice, as it pertains to sex offenses, when the

11   court rejected a due process challenge to Federal Rules of Evidence 414.  Evidence Code section

12   1108 is analogous to Federal Rules of Evidence 413 and 414 which govern the admissibility of

13   evidence of prior conduct in cases of sexual assault and child molestation.  The Ninth Circuit

14   concluded that Rule 414 did not violate due process because Rule 413 (the federal equivalent to

15   California Evidence Code section 352) acts as a filter that results in the exclusion of evidence

16   that is so prejudicial as to constitute a due process violation.

17       Evidence Code 1108 was modeled after Rule 414 and operates in an analogous manner in

18   that it permits admission of evidence of a defendant's prior sexual offenses and is subject to the

19   balancing test of Evidence Code section 352 (the state analogous to Rule 413).  As Respondent

20   submits, Petitioner has failed to show that "the traditional ban on propensity evidence involves a

21   'fundamental conception of justice'" which is violated by Evidence Code section 1108.  <u>See</u>

22   <u>LeMay</u>, 260 F.3d at 1025.  Thus, Petitioner has failed to demonstrate that the admission of

23   propensity evidence violated due process.

24       Further, the state courts' determination of this issue was not contrary to, or an

25   unreasonable application of, clearly established Supreme Court precedent.  There is no United

26   States Supreme Court authority finding that the admission of evidence of other crimes to prove

27   propensity violates due process.  In fact, the Supreme Court has expressed no opinion on the

28   question whether the admission of evidence of other crimes solely to prove propensity violates

11

1   due process.  See Estelle, 502 U.S. at 75 n. 5 ["[W]e express no opinion on whether a state law

2   would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show

3   propensity to commit a charged crime".]  Accordingly, the petition for writ of habeas corpus on

4   this claim must be denied.

5   E.      Violation of Ex Post Facto Clause (Claim Three)

6           Petitioner contends that the admission of the propensity evidence under Evidence Code

7   section 1108 violated the Ex Post Facto Clause of the United States Constitution.[3]

8               Article I, § 10 of the U.S. Constitution provides: "No State
            shall ... pass any ... ex post facto law." The Ex Post Facto Clause prohibits the
9           states from enacting any law "which imposes a punishment for an act which was
            not punishable at the time it was committed; or imposes additional punishment to
10          that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981), quoting
            Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325-26 (1866). "[T]he focus of
11          the ex post facto inquiry is not on whether a legislative change produces some
            sort of 'disadvantage,' ... but on whether any such change alters the definition of
12          criminal conduct or increases the penalty by which a crime is punishable."
            California Dep't of Corrections v. Morales, 514 U.S. 499, 506 n. 3 (1995).
13

14          The ex post facto clause prohibits a state from enacting a law that imposes additional

15   punishment for a crime than the punishment was when the defendant committed the crime.

16   Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 964 (1981).  A law violates the ex post facto

17   clause under four circumstances:  (1) when it punishes a act which was not a crime when it was

18   committed; (2)  when it makes a crime's punishment greater than when the crime was committed;

19   (3)  when it deprives a person of a defense available at the time the crime was committed; or (4)

20   when it alters the rules of evidence and receives less or different testimony than the law required

21   at the time of the commission of the offense, in order to convict the offender.  Collins v.

22   Youngblood, 497 U.S. 37, 42, 110 S.Ct. 2715, 2719 (1990); Carmell v. Texas, 529 U.S. 513, 522

23   (2000).  The fourth category, at issue here, prohibits both laws that lower the burden of proof and

24   laws that reduce the quantum of evidence necessary to meet that burden.  Cf. Carmell, 529 U.S.

25   at 541.

26

27          [3]  To the extent Petitioner argues that section 1108 violates the California State Constitution's pain against
        ex post facto laws, it is not cognizable as the claim does not allege a violation of federal law.  28 U.S.C. §
28      2254(d)(1).

Defense counsel raised the instant ex post facto claim to the trial court in opposition to the prosecution's motion to introduce the propensity evidence.

Evidence Code section 1108 was enacted in 1995 and became effective January 1, 1996. (Stats. 1995, ch. 439, § 2; Gov. Code, § 9600; Evid. Code, § 12.)  The uncharged acts against Petitioner's daughter, admitted as the propensity evidence, all occurred prior to the enactment of Evidence Code section 1108.  The incidents occurred in 1989, 1991, 1993, and until the end of 1994.  (RT 14.)

In rejecting Petitioner's claim on direct appeal, the Court held in relevant part:

> Evidence Code section 1108, . . . simply added a new type of evidence which the jury may consider when deciding the charge has been proven beyond a reasonable doubt.  Evidence Code section 1108 thus falls squarely within *Collins* rather than *Carmell*.  Admission of the prior uncharged offenses did not violate the ex post facto clause of either the state or federal Constitutions.

(Opinion, at 19.)

The Court of Appeal properly identified and applied the controlling Supreme Court authority, and its decision is neither contrary to, nor an unreasonable application of that authority. Although section 1108 was enacted after the uncharged offenses occurred, it did not lower the burden of proof for the prosecution and did not change the quantum of evidence necessary to convict.  There is no showing that section 1108 on its face or as applied altered the burden of proof of the amount of evidence necessary to convict Petitioner.  Accordingly, the change in the evidence allowed under section 1108 was not a violation against the prohibition of the Ex Post Facto Clause.  Thus, Petitioner is not entitled to relief on this claim.

F.   <u>Instructional Error (Claim Four)</u>

Petitioner contends that the trial court erroneously instructed the jury with a version of CALJIC No. 2.50.01 that was in use prior to the 1999 revision.

CALJIC No. 2.50.01, as read and given to the jury in this case, stated the following:

> Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense on one or more occasions other than that charged in the case.

> Sexual offense means a crime under the laws of the state or of the United States that involve any of the following: Any conduct made criminal by the Penal Code Section 288 or 261(a)(2).  The elements of these crimes are set forth

13

1    elsewhere in these instructions.

2            If you find that the defendant committed a prior sexual offense, you may
     but are not required to infer that the defendant had a disposition to commit the
3    same or similar type sexual offenses.  If you find that the defendant had this
     disposition, you may but are not required to infer that he was likely to commit and
4    did commit the crime or crimes of which he is accused.  You must not consider
     this evidence for any other purpose.

5

6    (CT 232.)

7            CALJIC No. 2.50.1, which was given following the above instruction, provides:

8            Within the meaning of the preceding section, the prosecution has the
     burden of proving by a preponderance of the evidence that a defendant committed
9    a sexual offense other than those for which he is on trial.

10           You must not consider this evidence for any purpose unless you find by a
     preponderance of the evidence that a defendant committed the other sexual
11   offense[s].

12   (CT 233.)

13           In Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004), the Ninth Circuit Court of Appeals ruled

14   that the pre-1999 version of CALJIC 2.50.01, coupled with CALJIC 2.50.1, impermissibly

15   lessened the standard of proof required to convict on the "sexual offenses" which were similar to

16   the uncharged "sexual offenses."  In its supplemental briefing, Respondent concedes that the

17   version of CALJIC 2.50.01 used in the instant case is the same version disapproved of in Gibson

18   and there is no way to materially distinguish it.  Thus, Respondent submits that the instant

19   petition for writ of habeas corpus must be granted with respect to Petitioner's conviction of five

20   counts of rape.  Applying the rationale set forth by the Ninth Circuit in Gibson, the trial court's

21   use of jury instructions CALJIC 2.50.01 and 2.50.1 allowed the jury to find Petitioner guilty of

22   the charged offenses by relying on facts found only by a preponderance of the evidence.  This

23   lessened the burden of proof under In re Winship, 397 U.S. 358 (1970), which requires the

24   prosecution to prove every element charged in a criminal offense beyond a reasonable doubt,

25   thereby depriving Petitioner of a "jury verdict within the meaning of the Sixth Amendment."

26   Sullivan v. Lousiana, 508 U.S. 275, 280 (1993).  In light of this ruling, this Court is compelled to

27   conclude that the state court's decision to use jury instructions CALJIC 2.50.01 and 2.50.1, and

28

14

the state appellate court's affirmation of that decision, were contrary to clearly established federal law as determined by the Supreme Court of the United States.  Because the evidence used to convict Petitioner of the rape charges is the same evidence used to convict Petitioner of the assault and kidnapping charges, and the evidence and incidents were so intertwined, the petition for writ of habeas corpus should be granted with respect to all of the convictions, i.e. five counts of rape, two counts of kidnapping, two counts of assault with a firearm and one count of assault with a deadly weapon.

G.    Trial Court's Inquiry as to Jury's Deliberations - Violation of Due Process (Claim Five)

Petitioner contends that the trial court's comments to the jury during their deliberations constituted impermissible coercion of the verdicts.

"Long recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." Tanner v. United States, 487 U.S. 107, 127 (1987). Comments by a state judge violate the Constitution if the comments effectively deny the defendant a trial by jury.  See Gonsoir v. Carven, 449 F.2d 20, 21 (9th Cir. 1971).  The trial judge can give comments and call the jury's attention to parts of the evidence so long as the comments neither distort the evidence nor add to it, and the judge reminds the jurors of their exclusive duty to determine the facts. Rodriguez v. Marshall, 125 F.3d 739, 749 (9th Cir. 1997).  Comments are improper if they coerce a verdict. Jiminez v. Myers, 40 F.3d 976, 979 (9th Cir. 1993).  The trial judge's comments are considered in the totality of the circumstances. Id. at 980.

On the first day of deliberations, the jury broke for the evening after only 25 minutes of deliberations.  The next day, the jury deliberated from 9:00 a.m. to 4:33 p.m.  At that time, the trial court brought the jury into the courtroom "just to touch base with you."  The court stated:

What I wanted to do is touch base with you and get a feel for where you are in your deliberations.  I want to ask the foreman, Mr. . . ., you got elected as foreman.  I just want some answers - - I want to ask questions very carefully. Give me one or two word answers, that is either yes or no. [¶] Has the jury been able to reach any verdicts at all?  Yes.

[THE COURT]: We're making progress.  I can get this testimony to you on this latest question here discussing this orange grove incident.  However, I'm just wondering, in trying to get a feel for this, would you like to break this morning, or do you want to have the court reporter read that portion back to you now and continue deliberations for awhile?  I'll let you be the spokesman for the crowd here.

[FOREPERSON]: In regard to that question, I think it would be good if we could have that at this time.

[THE COURT]: Right now?

[FOREPERSON]: Yes, sir.

[THE COURT]: I'll get her to get that to you.  I don't think it's a great deal of testimony.  If I'm not mistaken, it may have been read already, at least a portion of it.  I'll have the court reporter find that, take it into you and read it and go back and continue deliberations.  I don't want to keep you here real late.  It's up to all of you, take a poll among yourselves.  As long as you are making progress, I don't want to interrupt that either.  I'm leaving that entirely up to you as far as a group what you want to do.

I'll get her to come back and read that testimony back to you.  You can go back in there.

(The proceedings were recessed at 4:35 p.m., and reconvened at 5:00 p.m.)

[THE COURT]: All the jurors, the defendant, both counsel are back. [Foreperson], I understand the jury wants to go home for the evening, is that correct?

[FOREPERSON]: That's correct, your Honor.

(RT 619-621.)

In rejecting Petitioner's claim on direct appeal, the Court held:

Nothing in the trial court's comments here may be construed as an attempt to pressure or coerce the jury.  In fact, [Petitioner] fails to mention in his cites to the record that the trial court, in response to the jury's request for some readback of testimony late in the afternoon, asked the jury if it would like to break for the evening and have the readback "first thing in the morning."  It was the jury foreman who asked that the readback take place right then instead.  The trial court also specifically stated to the jury:

"I don't want to keep you here real late.  It's up to all of you, take a poll among yourselves.  As long as you are making progress, I don't want to interrupt that either.  I'm leaving that entirely up to you as far as a group what you want to do."

[Petitioner's] contention of coercion on the part of the trial court is rejected.

(Opinion, at 24.)

As Respondent submits, the trial judge did not comment or express any opinion regarding the evidence in this case.  The court's questioning and inquiry was not presented in a manner that would suggest to the jury that the court felt this was an easy case or that the judge was pressuring them to finish their deliberations.  To the contrary, the Court expressed to the jury that the length of deliberations was their decision and that he did not want to interrupt their progress.  Further, as stated by the Court of Appeal, it was the jury foreman who declared his desire to have the readback take place right then instead of the next morning.  In reviewing the totality of the circumstances, it simply cannot be said that the judge's inquiry into the process was in anyway

1   coercive to the verdict reached in this case.  Claim Five is denied.

2   H.    Enhancement on Count 8 (Claim Six)

3        Petitioner contends that the trial court erred when it sentenced him to a three-year

4   enhancement on Count 8 (rape by force of fear).

5        With respect to this claim, the Court of Appeal held as follows:

6            [Petitioner] was found guilty of the offense in count 8.  The firearm
         allegation for that count pursuant to section 12022.3 was found to be not true.
7        However, at sentencing, the court imposed the statutory three-year term for that
         enhancement. [Petitioner] contends this was done in error.  Respondent agrees.
8            Both parties are correct. [Petitioner's] sentence of three years for the
         enhancement to count 8 must be stricken.

9

10       Because Petitioner received from the appellate court the relief he seeks from this Court,

11  his claim is moot and must be DENIED on that basis.

12  I.    Firearm Enhancement on Count 7 (Claim Seven)

13       Petitioner contends that the trial court erred when it imposed a firearm enhancement on

14  Count 7.

15       With regard to this claim, the Court of Appeal, based on both parties concession, held

16  that the sentence of eight months imposed for the firearm enhancement in Count 7 should be

17  stricken.

18       Just as the claim raised above, because Petitioner received from the appellate court the

19  relief he seeks from this Court, his claim is moot and must be DENIED on that basis.

20  J.    Consecutive Term on Conviction For Rape by Force or Fear/Ineffective Assistance of
          Defense Counsel (Claim Eight)
21
         Petitioner contends that the trial court erred when it imposed a consecutive term on Count
22
    2 (one of the two counts of rape by force or fear of Maria in the motel room).  Petitioner further
23
    alleges that defense counsel was ineffective for failing to object to this consecutive term at the
24
    sentencing hearing.
25
         1.    Imposition of Consecutive Term
26
         Respondent argues that although this claim was presented to the Court of Appeal, it was
27
    not presented to the California Supreme Court and is therefore unexhausted.  Alternatively,
28

1  Respondent argues that because the Court of Appeal rejected the claim based on Petitioner's

2  waiver of the issue when he failed to object at the sentencing hearing, it is procedurally defaulted.

3      First, the Court finds that Petitioner's claim that the trial court erred in imposing a

4  consecutive term on Count 2, is not cognizable in the instant federal petition for writ of habeas

5  corpus.  28 U.S.C. § 2254(a).  A federal court may only grant a petition for writ of habeas corpus

6  if the petitioner is in custody in violation of the Constitution and clearly established federal law.

7  28 U.S.C. § 2254 (a), (d).  Habeas corpus relief is not available to correct alleged errors in the

8  state court's application or interpretation of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68,

9  112 S.Ct. 475, 480 (1991); Middleton v. Cupp, 768 F.2d 1083, 1084-85 (9th Cir.1985), *cert*

10  *denied*, 478 U.S. 1021, 106 S.Ct. 3336 (1986).

11      For example, if a petitioner asserts that the state court has misapplied the state court's

12  sentencing laws, a federal court may not review the facts and decide for itself whether it believes

13  the state court applied the sentencing law correctly.  Miller v. Vasquez, 868 F.2d 1116, 1118

14  (1989), *cert denied*, 499 U.S. 963, 111 S.Ct. 1591 (1991).  An assertion that a state court

15  inappropriately applied  "its own sentencing laws does not justify federal habeas relief."

16  Christian v. Whode, 41 F.3d 461, 469 (1994).  "The decision whether to impose sentences

17  concurrently or consecutively is a matter of state criminal procedure and is not within the

18  purview of federal habeas corpus."  Cacoperdo v. Demostheses, 37 F.3d 504, 507-08 (9th Cir.

19  1994).

20      Second, as Respondent submits the claim is unexhausted.  A petitioner who is in state

21  custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus

22  must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The exhaustion doctrine is based

23  on comity to the state court and gives the state court the initial opportunity to correct the state's

24  alleged constitutional deprivations.  Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546,

25  2554-55 (1991);  Rose v. Lundy, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203 (1982); Buffalo v.

26  Sunn, 854 F.2d 1158, 1163 (9th Cir. 1988).

27      A petitioner can satisfy the exhaustion requirement by providing the highest state court

28  with a full and fair opportunity to consider each claim before presenting it to the federal court.

1  Picard v. Connor, 404 U.S. 270, 276, 92 S.Ct. 509, 512 (1971); Johnson v. Zenon, 88 F.3d 828,

2  829 (9th Cir. 1996). A federal court will find that the highest state court was given a full and fair

3  opportunity to hear a claim if the petitioner has presented the highest state court with the claim's

4  factual and legal basis. Duncan v. Henry, 513 U.S. 364, 365 (1995) (legal basis); Kenney v.

5  Tamayo-Reyes, 504 U.S. 1 (1992) (factual basis).

6       Additionally, the petitioner must have specifically told the state court that he was raising

7  a federal constitutional claim. Duncan, 513 U.S. at 365-66; Lyons v. Crawford, 232 F.3d 666,

8  669 (9th Cir.2000), *amended*, 247 F.3d 904 (2001); Hiivala v. Wood, 195 F.3d 1098, 1106 (9th

9  Cir.1999); Keating v. Hood, 133 F.3d 1240, 1241 (9th Cir.1998). In Duncan, the United States

10  Supreme Court reiterated the rule as follows:

11       In Picard v. Connor, 404 U.S. 270, 275 . . . (1971), we said that exhaustion
    of state remedies requires that petitioners "fairly presen[t]" federal claims to the

12  state courts in order to give the State the "'opportunity to pass upon and correct
    alleged violations of the prisoners' federal rights" (some internal quotation marks

13  omitted). If state courts are to be given the opportunity to correct alleged violations
    of prisoners' federal rights, they must surely be alerted to the fact that the prisoners

14  are asserting claims under the United States Constitution. If a habeas petitioner
    wishes to claim that an evidentiary ruling at a state court trial denied him the due

15  process of law guaranteed by the Fourteenth Amendment, he must say so, not only
    in federal court, but in state court.

16
    Duncan, 513 U.S. at 365-366. The Ninth Circuit examined the rule further, stating:

17
18       Our rule is that a state prisoner has not "fairly presented" (and thus
    exhausted) his federal claims in state court *unless he specifically indicated to*

19  *that court that those claims were based on federal law*. See Shumway v. Payne,
    223 F.3d 982, 987-88 (9th Cir. 2000). Since the Supreme Court's decision in

20  Duncan, this court has held that the *petitioner must make the federal basis of the*
    *claim explicit either by citing federal law or the decisions of federal courts, even*

21  *if the federal basis is "self-evident*," Gatlin v. Madding, 189 F.3d 882, 889
    (9th Cir. 1999) (citing Anderson v. Harless, 459 U.S. 4, 7 . . . (1982), or the

22  underlying claim would be decided under state law on the same considerations
    that would control resolution of the claim on federal grounds. Hiivala v. Wood,

23  195 F3d 1098, 1106-07 (9th Cir. 1999); Johnson v. Zenon, 88 F.3d 828, 830-31
    (9th Cir. 1996); . . . .

24       In Johnson, we explained that the petitioner must alert the state court to
    the fact that the relevant claim is a federal one without regard to how similar the

25  state and federal standards for reviewing the claim may be or how obvious the
    violation of federal law is.

26  Lyons v. Crawford, 232 F.3d 666, 668-669 (9th Cir. 2000) (italics added).

27       The Court has reviewed the petition for review filed in the California Supreme Court and

28  finds Respondent's contention is correct. Petitioner's instant claim that the trial court erred in

1   imposing consecutive terms on Count 2 was not raised in the petition before the California

2   Supreme Court.  (Exhibit E, attached to Respondent's Answer.)

3        In 1996, Congress enacted the Anti-Terrorism and Effective Death Penalty Act. Pub.L.

4   No 104-132, 110 Stat. 1214.  Under the AEDPA, exhaustion can be waived by Respondent. 28

5   U.S.C. § 2254(b)(C).  The Court can also excuse exhaustion if "(i) there is an absence of

6   available State corrective process; or (ii) circumstances exist that render such a process

7   ineffective to protect the rights of the application." 28 U.S.C. § 2254(b)(1)(B).  In this case,

8   Respondent does not waive exhaustion.  In addition, California provides avenues for Petitioner to

9   pursue his claim.  For example, the claim could have been presented in the petition for review, on

10  in the petition for writ of habeas corpus.  See Cal. Penal Code §§ 1473 - 1478.  Finally, there are

11  not sufficient circumstances in this case for the Court to ignore the United States Supreme

12  Court's admonishment that comity demands exhaustion and find that California's corrective

13  processes are ineffective to protect Petitioner's rights.

14       Third, even if the claim was cognizable and exhausted, the Court is procedurally barred

15  from reviewing it.

16       Federal courts "will not review a question of federal law decided by a state court if the

17  decision of that court rests on a state law ground that is independent of the federal question and

18  adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546

19  (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  If the court finds an independent

20  and adequate state procedural ground, "federal habeas review is barred unless the prisoner can

21  demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure

22  to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9

23  F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146,

24  1150 (9th Cir. 2000).

25       "For a state procedural rule to be 'independent,' the state law basis for the decision must

26  not be interwoven with federal law."  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001)

27  (citing Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469 (1983)); Morales v. Calderon,

28  85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision

1   'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'" (*quoting*

2   <u>Coleman</u>, 501 U.S. at 735, 111 S.Ct. 2456)).  "A state law is so interwoven if  'the state has made

3   application of the procedural bar depend on an antecedent ruling on federal law [such as] the

4   determination of whether federal constitutional error has been committed.'"  <u>Park</u>, 202 F.3d at

5   1152 (*quoting* <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

6        To be deemed adequate, the state law ground for decision must be well-established and

7   consistently applied.  <u>Poland v. Stewart</u>, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural

8   rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly

9   followed' at the time it was applied by the state court.")(*quoting* <u>Ford v. Georgia</u>, 498 U.S. 411,

10  424, 111 S.Ct. 850 (1991)).  Although a state court's exercise of judicial discretion will not

11  necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment

12  according to standards that, at least over time, can become known and understood within

13  reasonable operating limits.'"  <u>Id</u>. at 377 (*quoting* <u>Morales</u>, 85 F.3d at 1392).

14       In <u>Bennett v. Mueller</u>, 322 F.3d 573, 580 (9th Cir. 2003), the Ninth Circuit held that

15  although the California untimeliness rule as expressed in <u>In Re Robbins</u> was an independent state

16  procedural ground, the Court could not conclude that it was an adequate state procedural ground

17  on the basis of the record before it.  The Ninth Circuit remanded the case to the district court to

18  determine the issue of adequacy (whether the timeliness bar was sufficiently well-established and

19  consistently applied at the time the default occurred).  <u>Id.</u>  While the ultimate burden of proving

20  adequacy rests with the respondent, the petitioner must place the state's affirmative defense of

21  independent and adequate state procedural grounds at issue "by asserting specific factual

22  allegations that demonstrate the inadequacy of the state procedure."  <u>Id.</u>

23       In finding that Petitioner waived this claim, the Court of Appeal stated:

24       Respondent contends [Petitioner] has waived any alleged defect in the
         court's sentencing choices and supporting rationale because he failed to object at

25       the time of sentencing.  We agree.
             In *People v. Scott* (1994) 9 Cal.4th 331, our Supreme Court held that the

26       failure to object waives trial court errors which "involve sentences which, though
         otherwise permitted by law, were imposed in a procedurally or factually flawed

27       manner."  (*Id*. at p. 354.)  However, the court cautioned that for this waiver
         doctrine to apply "there must be a meaningful opportunity to object to the kinds of

28       claims otherwise deemed waived by today's decision.  This opportunity can occur

                                                    21

> only if, during the course of the sentencing hearing itself and before objections are made, the parties are clearly apprised of the sentence the court intends to impose and the reasons that support any discretionary choices." (*Id*. at 356.)
> ....................................................................................................................................
> In the instant case, the probation report filed two and one-half months prior to sentencing recommended, inter alia, that consecutive sentences be imposed on Counts 1 and 2. At the sentencing hearing, the prosecutor argued that consecutive sentences should be imposed on these counts. The trial court then also specifically articulated why it imposed consecutive sentences pursuant to section 667.6, subdivision (c). On this record, we conclude [Petitioner] was appraised of the intended sentence and had a reasonable opportunity to object. [Petitioner] cannot raise this issue for the first time on appeal.

(Respondent's Exhibit D, at 28-30.)

Thus, in the instant case, the Fifth District Court of Appeal rejected Petitioner's claim because it was procedurally defective. Specifically, as stated by the Court of Appeal, under California law, a party who fails to object to a particular sentence in the trial court waives the issue on appeal. People v. Kelly, 52 Cal.App.4th 568, 583 (1997); People v. DeJesus, 38 Cal.App.4th 1, 27 (1995); People v. Scott, 9 Cal.4th 331, 354-55 (1994). As the Court of Appeal pointed out, a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal exists for those sentences which are "unauthorized," i.e., "where it could not lawfully be imposed under any circumstance in the particular case." Scott, 9 Cal.4th at 354.

Here, Petitioner's consecutive term on count 2 (one of five counts of rape by force or fear) was authorized by law. As noted by the Court of Appeal, defense counsel asked the trial court to exercise its discretion to run Petitioner's sentence concurrent rather than consecutive. Thus, as the determination whether to run the sentences concurrent or consecutive was discretionary, the trial court's determination to run the sentences consecutive was authorized by law. The sentence comported with the statutory range of punishment for Petitioner's convicted offenses. Moreover, as stated by the Court of Appeal, Petitioner was well aware of his exposure to a consecutive sentence. Further, the trial court specifically articulated why it imposed consecutive terms pursuant to California Penal Code section 667.6, subdivision (c), stating the following:

> As to the violation of 261(a)(2) of the Penal Code in Count 2, I'm making a finding that that particular event occurred on, as I recall, the 15th of January, or

thereabouts - - strike that - - 15th of July, or thereabouts, and was somewhat connected with Count 1.  However, as the evidence came out, there did appear to be several hours or minutes and hours between the two events.  I'm making the finding that there was sufficient time for the defendant to collect himself and make the conscious decision to again inflict the crime upon the victim here.  That's pursuant to 667.6(c) of the Penal Code.  He did have ample time and reasonable opportunity to reflect on the viciousness and calllousness of the acts and conscientiously made a decision to resume and commit Count 2.

Accordingly, the term in Count 2 is likewise the upper term of eight years, plus three years for the 12022.3 allegation, for eleven years.  That is consecutive to the term in Count 1.

(RT of 11/16/1999 at 26-27.)

The procedural default employed by the Court of Appeal is an independent state procedural ground not interwoven with federal law.  In addition, it is an adequate state procedural ground in that the bar was sufficiently well-established and consistently applied at the time the default occurred.  People v. Williams, 61 Cal.App.4th 649, 656 (1998); People v. Kelly, 52 Cal.App.4th 568, 583 (1997); People v. DeJesus, 38 Cal.App.4th 1, 27 (1995); People v. Scott, 9 Cal.4th 331, 354-55 (1994).

In addition, Petitioner has failed to demonstrate cause and prejudice for the default. Therefore, the claim is procedurally defaulted.

2.      Ineffective Assistance of Defense Counsel

The Court will, however, review Petitioner's claim that defense counsel was ineffective for failing to object to the consecutive term at the sentencing hearing.[4]

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

---

[4] Although the Court recognizes that this claim was raised on direct appeal, it was not raised in the petition for review submitted to the California Supreme Court.  (Exhibit E, attached to Respondent's Answer.)  Thus, it is unexhausted; however, because the claim must be denied on the merits, the Court will excuse exhaustion and review its merit. 28 U.S.C. § 2254(b)(2).

23

1 the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

2 representation fell below an objective standard of reasonableness, and must identify counsel's

3 alleged acts or omissions that were not the result of reasonable professional judgment

4 considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

5 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court

6 indulges a strong presumption that counsel's conduct falls within the wide range of reasonable

7 professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

8 Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

9        Second, the petitioner must show that counsel's errors were so egregious as to deprive

10 defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

11 also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

12 ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

13 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

14 was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

15 (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

16 have been different.

17        A court need not determine whether counsel's performance was deficient before

18 examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

19 Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

20 prejudice, any deficiency that does not result in prejudice must necessarily fail.

21        Ineffective assistance of counsel claims are analyzed under the "unreasonable application"

22 prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062

23 (2000).

24        With regard to Petitioner's claim that counsel was ineffective for failing to object at the

25 sentencing hearing, the Court of Appeal held:

26        The record indicates that relative to [Petitioner's] sentencing hearing, trial
         counsel filed an "Alternative Social Report and Statement of Mitigation," which

27       included a request for concurrent sentences.  At the sentencing hearing, counsel
         also asked the trial court to exercise its discretion and run [Petitioner's] sentence

28       concurrently.  As such, it cannot be said [Petitioner's] trial counsel's

1    representation of [Petitioner] was deficient.

2           The trial court considered [Petitioner's] probation report prior to
     sentencing.  It also read and considered letters submitted by [Petitioner] and the
3    sentencing memorandum before imposing sentence.  The trial court found
     numerous factors in aggravation and only one factor, [Petitioner's] insignificant
4    criminal history, in mitigation when it sentenced [Petitioner].  It is not reasonably
     probable [Petitioner] would have received a more favorable sentence had trial
5    counsel objected.

6    (Opinion, at 30.)

7           The state courts' determination of this issue is not contrary to, or an unreasonable

8    application of, clearly established Supreme Court precedent.  Because the information of which

9    counsel would have presented through any objection was before and considered by the trial court,

10   it simply cannot be said that counsel was deficient or that there is a reasonable probability had

11   there been an objection the result would have been different.  Thus, Petitioner's claim must be

12   denied.

13   K.    Concurrent Term on Count 3 (Claim Nine)

14          Petitioner contends that the trial court erred in imposing a concurrent term on Count 3

15   (assault with a deadly weapon).

16          At stated by the Court of Appeal, M. testified that Petitioner pulled a knife on her when

17   they were in the motel room and told her he wanted to have sex with her.  Petitioner then raped

18   M.  The trial court subsequently sentenced Petitioner to the upper term of eight years on the rape

19   which took place in the motel and sentenced Petitioner to an additional three years for the use of

20   the knife in that incident.  Petitioner was also sentenced to the upper term of four years in count 3

21   for assault with a deadly weapon, which was based on the same incident in the motel room.

22          The Court of Appeal agreed with Petitioner that the trial court erred when it imposed a

23   concurrent, rather than stayed, term on Count 3, the assault with a deadly weapon against M.  The

24   Court stated, "[w]e agree that imposing the knife enhancements in counts 1 and 2 as well as

25   sentencing [Petitioner] for assault with a deadly weapon, a knife, in count 3 based on the same

26   incident would constitute impermissible double punishment under section 654."  (Opinion, at

27   31.)

28          Because Petitioner received from the appellate court the relief he seeks from this Court,

                                             25

his claim is moot and must be DENIED on that basis.

L.    Imposition of Concurrent Terms Rather Than Stayed Terms on Counts 4 and 5 (Claim Ten)

Petitioner contends that the trial court erred when it imposed concurrent terms on Counts 4 and 5 instead of staying the terms under California Penal Code section 654.

Respondents contends that this claim is unexhausted and, in any event, does not present a cognizable federal claim for review pursuant to § 2254.  Respondent is correct.

Although the claim was raised in the direct appeal presented to the Fifth District Court of Appeal, it was not presented in the petition for review submitted to the California Supreme Court.  (Exhibit E, attached to Answer.)  Thus, the claim is unexhausted.  However, because the claim is without merit, the Court will excuse exhaustion.  28 U.S.C. § 2254 (b)(2).

The claim is not reviewable in the instant federal habeas corpus petition.  As Respondent indicates habeas corpus relief is not available to correct alleged errors in the state court's application or interpretation of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); Middleton v. Cupp, 768 F.2d 1083, 1084-85 (9th Cir.1985), cert denied, 478 U.S. 1021, 106 S.Ct. 3336 (1986); see also 28 U.S.C. §§ 2254(a), (b)(2).

As Respondent submits in Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir. 1989), the petitioner alleged that the state trial court violated California Penal Code section 654 when it imposed two sentences for rape in concert.  The Ninth Circuit reiterated that "we cannot review the contention as a matter of state law because 28 U.S.C. § 2254(a) (1982) authorizes the federal courts to grant habeas corpus relief only for violations of federal law."[5]  Id.

Thus, because this claim fails to raise a federal law violation, this Court is barred from reviewing it.

M.    Imposition of Parole Revocation Fine (Claim Eleven)

Petitioner contends that the trial court erred when it imposed a parole revocation fine.

At sentencing, the trial court imposed a parole revocation fine pursuant to section

---

[5]  Compare, however, an alternative claim that the violation rises to the level of a Due Process violation.  Id. at 687-688.  No such due process claim was raised in the instant petition or addressed in the traverse.  Accordingly, the claim is raised as a pure state law claim.

1202.45 in the amount of $800, equal to the amount of the restitution fine. Petitioner contends that because the conduct underlying his conviction occurred prior to the enactment of section 1202.45, imposition of the fine pursuant to that section violates the ex post facto clause of the United States Constitution.

The Court of Appeal agreed with Petitioner finding that "since [Petitioner] committed the underlying offenses prior to the enactment of section 1202.45, the court's imposition of a parole revocation fine pursuant to that section violated the state and federal Constitutions' ex post facto clause," and the fine was stricken.  (Opinion, at 36.)

Because Petitioner received from the appellate court the relief he seeks from this Court, his claim is moot and must be DENIED on that basis.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The petition for writ of habeas corpus be GRANTED as to all of Petitioner's convictions, i.e. five counts of rape, two counts of kidnapping, two counts of assault with a firearm, and one count of assault with a deadly weapon, based on the trial court's use of jury instructions CALJIC 2.50.01 and 2.50.1, subject to the State's right to retry Petitioner;

2.      The remaining claims in the petition for writ of habeas corpus be DENIED; and

3.      If this recommendation is adopted, the State must, within ninety (90) days from the date of service of the District Judge's order, inform the Court whether it will retry Petitioner on the charges.

These Findings and Recommendations are submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after

1   service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

2   28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the

3   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

4   F.2d 1153 (9th Cir. 1991).

5

6       IT IS SO ORDERED.

7   **Dated:   February 14, 2006**          **/s/ Dennis L. Beck**
    3b142a                        UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28